The STATE OF NEW YORK and Langdon Marsh, as Acting Commissioner of the New York State Department of Environmental Conservation and Trustee of the Natural Resources, Plaintiffs,

v.

PANEX INDUSTRIES, INC., Panex Industries, Inc. Liquidating Trust, Daniel Rosenbloom and Paul Lazare, as Trustees of Panex Industries, Inc. Liquidating Trust, Alpine Group, Inc., Rochester Button Company, Inc., Turbodyne Electric Power Corporation, McGraw–Edison Company, Inc., Dresser–Rand Company, Abb Air Preheater, Inc. and Village of Wellsville, Defendants.

No. 94–CV–0400E(H).

United States District Court,
W.D. New York.

Aug. 16, 1994.

Roberta G. Gordon, Asst. Atty. Gen., Environmental Protection Bureau, New York City, for plaintiff.

Richard G. Leland, Joseph Zuckerman, Rosenman & Colin, New York City, for Panex defendants.

Daniel Riesel, Sive, Paget & Riesel, P.C., New York City, for Edison–McGraw.

Richard A. Palumbo, Boylan, Brown, Code, Fowler & Wilson, Rochester, NY, for Village of Wellsville.

Thomas Moore Griffin, New York City, for Alpine Group.

Morgan G. Graham, Kevin M. Hogan, Philips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY, for ABB Air Preheater.

Laurie Styka Bloom, Nixon, Hargrave, Devans & Doyle, Buffalo, NY, for Dresser–Rand and Turbodyne Elec.

John Osnato, Kavanagh Peters Powell & Osnato, New York City, for Rochester Button.

## MEMORANDUM AND ORDER

ELFVIN, District Judge.

The plaintiffs brought this action pursuant to New York's common law and the Comprehensive Environmental Response, Compensation & Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, seeking from the defendants costs for the cleanup of the Wellsville–Andover landfill ("the Site") in which defendant Panex Industries Inc. ("Panex")—a Delaware corporation—allegedly disposed of chemicals that subsequently leached into the soil, groundwater, wells and springs near the Site. Before this Court is the plaintiffs' motion to enjoin preliminarily the Trustees of defendant Panex Industries, Inc. Liquidating Trust ("the Trust") from expending its assets until the Trustees shall have provided the plaintiffs with discovery re the current assets and expenditures of the Trust and set aside assets of the Trust for the plaintiffs' claims pursuant to a plan for the equitable distribution of such assets as allegedly is required by Delaware law. The motion will be denied. The facts as set forth in the defendants' papers and uncontested by the plaintiffs follow.

Panex, formerly known as Duplan, was a clothing manufacturer. One of its divisions—Rochester Button Company, Inc.—manufactured buttons in Wellsville, N.Y. and, along with others of the defendants, allegedly illegally disposed of in the Site chemical wastes which New York's Department of Environmental Conservation ("the DEC") estimates will cost $14.6 million to eradicate.

In 1976 Duplan petitioned for reorganization under Chapter XI of the Bankruptcy Act and subsequently the bankruptcy judge appointed a trustee. Duplan emerged from bankruptcy in 1981 as the renamed, reorganized and recapitalized entity, Panex Industries, Inc.

After the sale of various of its assets, Panex's stockholders adopted a Plan of Liquidation September 21, 1984 and Panex filed a Certificate of Dissolution with Delaware's Secretary of State April 15, 1985. Thereafter it sold its manufacturing facilities, distributed specified assets to its shareholders and, on September 12, 1985, formed the Trust to wind up its affairs in compliance with Delaware law. Such was accomplished before the plaintiffs had asserted any of their instant claims.

The Trust was established

"for the sole purpose of holding the Assets transferred to it by Panex on behalf of the Beneficiaries [Panex's shareholders], enforcing the rights of the Beneficiaries thereto, collecting the income thereon, satisfying any and all liabilities of Panex which are not paid or otherwise discharged, distributing the Trust Property to the Beneficiaries, and taking such other action as is necessary to conserve and protect the Trust Property and to provide for the orderly liquidation of any and all of the Assets." Panex Industries Stockholders' Liquidating Trust Agreement ("the Agreement"), at Section 3.1 (*see* Affidavit of Roberta G. Gordon, Esq. in support of Plaintiffs' Motion for a Preliminary Injunction, at Exh. B, and Affidavit of Joseph Zuckerman, Esq. in Opposition to said Motion, at Exh. E.)

The Trust was to terminate after three years but was to continue for up to nine additional years "for the limited purpose of discharging any known liabilities of the Trust or of Panex or liabilities of the Trust or of Panex which the Trustees have reasonable grounds to believe may be asserted * * *." The Agreement, at Section 8.1. The Trust currently has approximately $1.275 million in assets, together with the possibility of indemnification from liability insurers.

In 1988 the plaintiffs informed Panex that they were asserting a CERCLA claim against it and requested that it take remedial action to clean up the Site. Periodically thereafter the plaintiffs requested that Panex provide information to them but they did not file the instant suit until May 25, 1994 after they had learned of the existence of the

Trust and that Panex and the Trustees were also defendants in other CERCLA suits— namely, in two CERCLA actions brought in 1992 in the United States Virgin Islands because of Panex's alleged polluting of the "Tutu Aquifer" there. In one such action— *Four Winds Plaza Partnership v. Texaco, Inc. et al. ("Four Winds"),* Civil Action No. 1989–224—Panex and the Trustees reached, in January 1994, a tentative settlement wherein they agreed to pay $890,000 of the $35 million originally sought by that plaintiff. After further negotiations the parties presented a settlement agreement dated April 27, 1994 to United States District Judge Stanley S. Brotman[1] who signed an Order and Decree stating that such was binding and effective and that payment was required. The other action—*Harthman et al. v. Texaco et al.,* Civil Action No. 1989–220—is ongoing. Various of the defendants in both actions have asserted cross-claims for contribution. Additionally, the United States Environmental Protection Agency has begun an investigation of the Tutu Aquifer and has notified the Trustees that they are "potentially responsible parties."

Between the time the settlement was signed and Judge Brotman's effectuation of such, the plaintiffs filed the instant action and thereafter (on June 28th) the Trustees filed a petition with Delaware's Court of Chancery seeking an order approving the payment of the *Four Winds* settlement or, in the alternative, for instruction re the payment of the settlement as that Court determines is proper under Delaware law.

The plaintiffs first argue that section 281(b) of Title 8 of Delaware's Corporation Code[2] and the Agreement itself require the Trustees to distribute ratably the Trust assets to contingent claimants such as the plaintiffs and thus that no payment should be made in the *Four Winds* (or any other) action until the Trustees devise a plan for such. However, section 281(b) was enacted two years after Panex had dissolved and the sparse relevant Delaware precedent is unclear as to whether it applies retroactively. Given that neither side disputes that Delaware law controls the Trust, this Court agrees with the defendants that Delaware is the proper forum in which to resolve this question and any other questions concerning the Trustees' duties under the Trust. Thus, because the defendants have petitioned the Delaware Court to resolve such questions and the plaintiffs will have a full opportunity to be heard there, and because the defendants have represented to this Court (during oral argument on July 8th) that, in the interim,[3] no or "minimal"[4] funds of the Trust would be expended to settle the *Four Winds* (or the other) action, the plaintiffs' arguments re the dictates of Delaware law are premature and need not be addressed.

■ The extraordinary remedy of a preliminary injunction will not issue unless the plaintiffs carry their burden of showing

"(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the

---

1. Judge Brotman is a United States District Court Judge for the District of New Jersey and was temporarily assigned to the United States District Court for the District of the Virgin Islands.

2. "A dissolved corporation or successor entity * * * shall pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional, or unmatured claims known to the corporation or such successor entity and all claims which are known to the dissolved corporation or such successor entity but for which the identity of the claimant is unknown. Such claims shall be paid in full and any such provision for payment made shall be made in full if there are sufficient funds. If there are insufficient funds, such claims and obligations shall be paid or provided for according to their priority

and, among claims of equal priority, ratably to the extent of funds legally available therefor. Any remaining funds shall be distributed to the stockholders of the dissolved corporation."

3. According to counsel for the defendants, the Delaware hearing is set for October 4th.

4. Defense counsel Zuckerman stated at the July 8th oral argument that the defendants might expend some trust assets (not exceeding $100,-000 or so) if such were needed as a "deal closer" should the defendants' insurers agreed to pay most but not all of the $890,000 *Four Winds* settlement. Trust funds also will be expended for ongoing attorneys' fees, but plaintiffs' counsel Gordon stated at the oral argument that the plaintiffs do not seek to enjoin the payment of such.

merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979).

Preservation of the *status quo pendente lite* is the purpose of a preliminary injunction, *Guinness & Sons v. Sterling Pub. Co.,* 732 F.2d 1095 (2d Cir.1984).

A showing of irreparable harm is the *sine qua non* of the plaintiffs' burden, *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir. 1985), and such harm must be " 'neither remote nor speculative, but actual and imminent.' " *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989). Further, the harm "must be one requiring a remedy of more than mere money damages"—*i.e.,* the remedy at law must be inadequate. *Ibid; In re Feit & Drexler, Inc.,* 760 F.2d 406, 409 (2d Cir.1985). Thus, " 'the general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment.' " *Mitsubishi Int'l v. Cardinal Textile Sales,* 14 F.3d 1507, 1521 (11th Cir.1994), *petition for cert. filed* (June 30, 1994), (*quoting from In re Fredeman Litigation,* 843 F.2d 821, 824 (5th Cir. 1988)); *accord, Home–Stake Production v. Talon Petroleum, C.A.,* 907 F.2d 1012, 1021 (10th Cir.1990). As was explained in *De Beers Mines v. United States,* 325 U.S. 212, 222–223, 65 S.Ct. 1130, 1135, 89 L.Ed. 1566 (1945) (the case upon which the just-cited cases relied), a contrary rule would create the situation where

> "[e]very suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence."

Because the relief the plaintiffs seek—enjoining the defendants to "set aside" assets of the Trust for the plaintiffs' claims pursuant to a plan for ratable distribution of such—is closely analogous to (if not identical to) freezing assets to secure a potential money judgment, the issue before this Court is whether there exists an applicable exception to the above mentioned general rule that would permit such relief.

■ Analysis of this question begins with *De Beers,* which involved an antitrust prosecution wherein the government sought pretrial a preliminary injunction to freeze the defendants' assets to ensure that they would be able to satisfy any contempt sanction the district court might impose should the defendants disobey any order granting the relief (*i.e.,* enjoining the defendants from future antitrust law violations) sought by the government from the district court. A preliminary injunction was reversed for the reasons noted above. Instructive (and ultimately dispositive of the instant motion) were the cited situations in which preliminary injunctions would be appropriate—*viz.,* when it was necessary to preserve "a fund or property which would have been the subject of the provisions of any final decree in the cause, or [to enjoin] action which would ultimately have been subject to injunction by final decree." *Id.* at 220, 65 S.Ct. at 1134. Injunctions are warranted in those situations because "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *Ibid.* Contrarily, the district court's injunction in *De Beers* concerned "a matter lying wholly outside the issues in the suit"—*i.e.,* "property which in no circumstances [could] be dealt with in any final injunction that may be entered," *ibid.*—and thus was not appropriate.

■ With these principles in mind, the untenability of the plaintiffs' position becomes clear. The intermediate relief

sought—freezing the defendants' assets—is not "of the same character as that which may be granted finally" because the ultimate relief sought is not equitable—*i.e.,* they do not seek to enjoin future illegal conduct or to freeze permanently the assets—but legal— *i.e.,* a money judgment. Although there are other exceptions where a court may preliminarily freeze assets to ensure satisfaction of a money judgment, none is applicable here. (See discussion below.) Further, the plaintiffs are not seeking to preserve a specific fund or *res* whose ownership is contested and which would be "the subject of the provisions of any final decree in the cause." Rather, the defendants' assets are unrelated to their alleged CERCLA liability in the sense that the plaintiffs in no way premise their claims on the existence of the assets or the manner in which they came to be. That is, the assets were neither a cause nor an effect of the alleged illegality, and thus *De Beers* bars intermediate relief. *See In re Fredeman Litigation,* 843 F.2d at 827–828.

The plaintiffs cite several cases for the proposition that "a preliminary injunction is proper to prevent a defendant from making a judgment uncollectible," Plaintiffs' Memorandum of Law in Support of a Preliminary Injunction and Order at 13, but this proposition needs to be qualified with the phrase "in exceptional circumstances." An examination of these cases reveals that the exceptional circumstances upon which the respective courts relied to freeze defendants' assets preliminarily are inapposite to the instant circumstances. For example, in *In re Feit & Drexler, Inc., supra,* wherein the defendant had engaged in numerous and substantial efforts to hide and secrete its assets from the court and the plaintiff, the district court's preliminary injunction was upheld, the appellate court noting that, "even where the ultimate relief sought is money damages," a preliminary injunction would issue "where it has been shown that the defendant 'intended to frustrate any judgment on the merits' by 'transfer[ring its assets] out of the jurisdiction.'" *Id.* at 416, *quoting from Productos Carnic, S.A. v. Cent. Am. Beef, Etc.,* 621 F.2d 683, 686 (5th Cir.1980). However, no such stealthy and disingenuous antics have been alleged herein. *Republic of Philippines v. Marcos,* 806 F.2d 344, 356 (2d Cir.1986), is inapposite because the assets which were the subject of that preliminary injunction, unlike those at bar, were also the subject of the suit itself and thus the intermediate relief sought was "of the same character as that which [might] be granted finally," a situation "always appropriate for a preliminary injunction." *De Beers,* 325 U.S. at 220, 65 S.Ct. at 1134. Others of the plaintiffs' cases are inapposite because they involved situations where fraud or illegality was afoot or likely with respect to the assets at issue.[5] *See, e.g., S.E.C. v. Unifund SAL,* 910 F.2d 1028 (2d Cir.1990); *Securities & Exchange Commission v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1106 (2d Cir.1972).

The plaintiffs place greatest reliance on *Deckert v. Independence Corp.,* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940). *Deckert* was a suit brought pursuant to the Securities Act of 1933 by purchasers of securities against a vendor of such for its alleged fraudulent misrepresentations concerning its sales of the securities. The issuance of a preliminary injunction restraining the transference or disposal of assets in a trust fund that consisted in part of payments made by the purchasers was upheld. In essence, the plaintiffs argue that the *Deckert* defendant's insolvency, that it was "threatened with many lawsuits, * * * that preferences to creditors [were] probable, and that its assets [were] in danger of dissipation and depletion," *id.* at 285, 61 S.Ct. at 232, were the material facts upon which the preliminary injunction was upheld and thus, given the analogous circumstances, that *Deckert* con-

---

5. The plaintiffs argue that an expenditure of assets by the defendants in the *Four Winds* settlement would constitute an illegality because Delaware law requires that the assets of a dissolved corporation be ratably distributed but, as mentioned, whether Delaware law so requires in this instance is not clear and the defendants have assured this Court they will not act until this question shall have been decided in Delaware. However, if it is there ruled that ratable distribution is required and if the defendants thereafter manifest an intention to act contrary to that ruling, this Court would be willing, at the least, to entertain a renewed preliminary injunction motion.

trols the instant motion. This Court disagrees. First, the ultimate relief sought by the *Deckert* plaintiffs was equitable, *id.* at 289, 61 S.Ct. at 233–34, and thus the preliminary relief sought was "of the same character as that which [might] be granted finally." Second and most telling, the trust fund, unlike the instant one, contained the very funds that were the subject of the lawsuit. That this (and not the defendant's insolvency, or the danger of depletion of assets, etc.) was the basis for the upholding of the preliminary injunction was made clear in *De Beers*, wherein *Deckert* was specifically cited as an example of an exceptional case where a freezing of assets was appropriate because it involved "a fund or property which would have been the subject of the provisions of any final decree in the cause." *De Beers*, 325 U.S. at 220, 65 S.Ct. at 1134. Third, *Deckert* concluded only that the trial judge did not abuse his discretion in granting the preliminary injunction, thus suggesting that a judge could also have reasonably ruled otherwise. *See Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 390 (7th Cir.1984) (in reviewing a district judge's granting of a preliminary injunction, "[t]he question for [an appellate court] is whether the judge exceeded the bounds of permissible choice in the circumstances, not what [the appellate court] would have done if [it] had been in his shoes.")

In summary, the plaintiffs have failed to establish an applicable exception to the general rule that a preliminary injunction may not issue to freeze a defendant's assets to protect a potential money judgment. The defendants' assets are unrelated to the underlying suit and the preliminary relief sought differs from what is ultimately sought (making the *De Beers* exceptions inapplicable) and there are no allegations either of fraud or of attempts to transfer assets out of the jurisdiction (making inapplicable *In re Feit, supra* and the securities fraud cases cited by the plaintiff).[6]

Assuming *arguendo* that the instant circumstances warranted an exception to this general rule, the plaintiffs' motion would still fail because they have not made the requisite showing that the purported irreparable harm (*i.e.*, the defendants' alleged inability to satisfy a money judgment) " 'is neither remote nor speculative, but actual and imminent.' " *Tucker, supra*, 888 F.2d at 975. For example, although the plaintiffs' claim that cleanup of the Site will cost $14.6 million they have made no representations re the percentage for which the instant defendants are responsible.[7] Given that there are five other named defendants which, for all this Court knows, may be responsible for most of the alleged pollution, that it is possible that the instant defendants' insurers will indemnify them for the *Four Winds* settlement, and that the defendants have $1.275 million in assets plus possible partial indemnification from their insurers for liability in the instant action, it is speculation rather than an actuality that the defendants' assets will fall short of their liabilities. The defendants also have assured this Court that no or minimal assets (beyond attorneys' fees) will be expended before the Delaware Chancery Court rules

---

**6.** Although the plaintiffs do not mention it, there is a split among the United States Courts of Appeal as to the extent of the exceptions allowable under *De Beers*. *Compare, e.g., ITT Community Development Corp. v. Barton*, 569 F.2d 1351 (5th Cir.1978), and *Rosen v. Cascade Intern., Inc.*, 21 F.3d 1520 (11th Cir.1994), both of which narrowly read the exceptions allowable under *De Beers, with Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186 (3rd Cir.1990), and *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir.1986), both of which expand the exceptions. *Teradyne* is particularly relevant to the plaintiffs' argument (although they did not cite it) because it characterized *Deckert, supra*, as holding that "a preliminary injunction, designed to freeze the status quo and protect the damages remedy is an appropriate form of relief when it is shown that the defendant is likely to be insolvent at the time of

judgment." *Teradyne*, 797 F.2d at 52. However, as mentioned this is a misreading of *Deckert* in light of *De Beers's* characterization of *Deckert* (*i.e.*, that insolvency *vel non* was not material to its decision), and we agree with the criticism of these cases by the United States Court of Appeals for the Eleventh Circuit that allowing such expansive exceptions "tortures the express language of *De Beers* and runs counter to established equitable principles." *Rosen*, 21 F.3d at 1529. Further, the United States Court of Appeals for the Second Circuit has never allowed such exceptions.

**7.** The plaintiffs do allege joint and several liability, but they have made no suggestion that the other defendants would be unable to satisfy their respective liabilities.

on October 4th, and that they will comply with any order of that Court, including one mandating the very relief the plaintiffs seek—*viz.*, a plan for ratable distribution of the trust assets—thus attenuating further any assertions that the alleged harm is "actual and imminent."

As to the plaintiffs' motion that an injunction issue to expedite discovery, the proper route to accomplish such would be to make discovery requests and then, if the defendants are recalcitrant or dilatory, to move this Court to compel discovery.[8]

Accordingly, it is hereby **ORDERED** that the plaintiffs' motions are denied.

---

8. At oral argument, counsel agreed that there could be a cross-utilization of discovered evidence—*viz.*, that what may be discovered herein may be used in the Delaware's Chancery Court and vice versa.